Filed 2/15/22  In re Y.C. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Y.C. et al., Persons Coming Under the Juvenile Court Law. | B311247 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GLORIA G.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP03426A-D) |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Mother Gloria G. appeals the juvenile court's orders sustaining a Welfare and Institutions Code section 387 supplemental petition and removing her four children from her custody, arguing they are not supported by substantial evidence. (All further statutory citations are to this code.) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This family came to the attention of the Los Angeles County Department of Children and Family Services (Department) in June 2020, following a referral that mother was unstable and suffering from schizophrenia. The family includes then 15-year-old Y.C., 12-year-old B.C., one-year-old M.P., eight-month-old Minnie P., mother, and father D.P. (the father of the two younger children). The father of Y.C. and B.C. is deceased. Mother speaks only Spanish and father speaks only English. They had been married for three years.

Mother was hospitalized in April, after attempting suicide and experiencing hallucinations. She told a clinician she was having sexual thoughts about her infant daughter, Minnie. B.C. was staying with a paternal aunt because mother did not want to care for her. B.C. told paternal aunt that mother and her stepfather D.P. verbally abused her, and he had slapped her. She wanted to stay with paternal aunt, but mother insisted that she return home.

When the social worker visited the family home, Y.C. denied any abuse, but reported that mother began acting "weird" in April. She was hearing voices and having "bad" visions of her younger children naked, being touched. She was given medication at the hospital, but she did not take it after she was discharged. The discharge papers from mother's psychiatric hospitalization stated mother was diagnosed with an unspecified

psychotic disorder, had been prescribed Zyprexa, and was told to follow up with Rio Hondo Mental Health for further treatment.

Mother admitted that before her hospitalization, she had taken pills to hurt herself, and that she was having visions and hearing voices asking what was the point of living. She admitted she stopped taking her psychotropic medication after her discharge from the hospital because it made her dizzy. She said she felt better after her release from the hospital, even though she was still hearing voices. Mother experienced an explicit sexual vision while she was being interviewed by the social worker, and had to walk away from infant Minnie, who began crying.

Father typically worked from 11:00 a.m. until 6:30 p.m. He reported that mother experienced symptoms of postpartum depression after Minnie's birth, but he was unsure of her diagnosis after the hospitalization.

Two days later, when the social worker called to follow up with the family, mother said God would cure her and she would get better without help from the Department. She believed the Department was trying to "destroy her family."

A Child and Family Team meeting (CFT) was held on June 17, 2020. Father agreed mother would benefit from mental health services, and mother agreed to participate in services, only because father wanted her to. After the meeting, mother contacted the social worker and said she changed her mind and would not be participating in services. She was considering allowing B.C. to reside with paternal aunt, because mother and B.C. were not getting along.

Because of concerns about mother's mental health, the Department filed a nondetained petition, alleging physical abuse by father and mother, and that mother's mental health problems

3

put the children at risk of harm. At the June 30, 2020 detention hearing, the court allowed the children to remain with mother and father, under the supervision of the Department. B.C. was allowed to reside with paternal aunt.

According to the October 2020 jurisdiction/disposition report, Y.C. wanted to remain in the family home so he could take care of his little sisters, Minnie and M.P. Sometimes mother would fall asleep and leave them unattended, so Y.C. would watch them.

Mother was still not taking any psychotropic medications and had not enrolled in any mental health services. She also denied having any hallucinations since her hospitalization, even though she previously admitted that she had. Mother would not sign a release to permit the Department access to her medical records. She also missed the mental health intake appointment that had been scheduled for her.

Father denied knowing about mother's mental health problems. He said he would not have married her had he known. The social worker admonished father that mother must have adult support to care for the children.

The combined jurisdiction/disposition hearing was held on November 10, 2020. The juvenile court sustained the petition and declared the children dependents. The children were ordered to remain home with mother and father under the supervision of the Department, with family maintenance services, including parenting classes. Mother was also to participate in counseling, a psychological assessment, and a psychiatric evaluation, take her prescribed medications, and she was not to be left alone with the children. Father was ordered to enroll in NAMI (National Alliance on Mental Illness) classes.

On January 22, 2021, the Department filed a supplemental petition pursuant to section 387, alleging mother was not complying with her case plan, failed to "fully" participate in therapy, and had not submitted to a psychological assessment or a psychiatric evaluation. The petition also alleged that father had not enrolled in NAMI.

During a family visit two months earlier, mother became very aggressive as B.C. tried to engage with M.P., blaming B.C. for the Department's involvement with the family. When the social worker tried to redirect mother, mother refused to stop attacking B.C. Therefore, the social worker had to terminate the visit. The younger children started to cry because of mother's screaming and hostile gestures. Mother continued to mutter, complaining that B.C. appeared "happy while [mother] was suffering."

During a visit to the family home a month later, Y.C. told the social worker that mother "needs help." She would often become obsessed about trivial things. Mother had also repeatedly attacked B.C. during a video call between Y.C. and B.C. Y.C. had to end the call because mother was so fixated on attacking his sister.

The social worker observed mother's behaviors were "odd, irrational, obsessive, paranoid, and defensive."

Mother refused to discuss the court-ordered services with the social worker, and became "agitated and defensive" when the social worker tried to discuss the requirement that she see a psychiatrist. She adamantly refused to take any medication. Father had not enrolled in NAMI and had little insight into mother's mental health issues. According to mother's therapist, she had only attended a "couple of sessions" and did not want to take medication. She had not yet seen a psychiatrist and did not

want to discuss "what happened" with her therapist. Mother believed God would cure her issues.

The Department obtained a removal warrant. M.P. and Minnie were placed in foster care on January 20, 2021. (They were later placed with family friends recommended by father.) B.C. and Y.C. were placed with paternal aunt. The children were detained from mother and father at the January 27, 2021 detention hearing.

On February 1, 2021, the court conducted a second detention hearing, pursuant to *In re Dennis H.* (1971) 19 Cal.App.3d 350, 352. Mother testified that she submitted to a psychiatric evaluation on January 21, 2021. The doctor had prescribed Zoloft, and she started taking it on January 22. It helped keep her calm. She also testified she was seeing a therapist once every two weeks. She was never alone with her children.

The court ordered that the children would remain detained from mother but released the younger children to father, giving father discretion to allow them to live with family or friends, and ordered that the older children remain suitably placed with paternal aunt. The court ordered mother to move out of the family home if the younger children were to reside there, and ordered that her visitation was to be monitored. The court admonished mother to take her medications and continue seeing a psychiatrist.

According to the Department's March 2021 jurisdiction/disposition report, father arranged for Minnie and M.P. to reside with family friends. Mother remained in the family home.

Y.C. reported that he did not want to live with mother. She would yell and cry constantly and became angry for no reason.

Her moods and personality changed from day to day. Mother was particularly cruel to B.C. Y.C. did not want unmonitored contact with mother. B.C. did not believe mother was getting better. She was acting like she hears voices. Paternal great-grandmother reported that mother was acting strangely during a recent visit with Y.C. and B.C., and did not make sense.

Father did not think the children were in danger with mother. He was uncertain whether she had been officially diagnosed with schizophrenia. He claimed mother was being cooperative, taking her medication, and seeing her therapist. Father was attending parenting classes.

The social worker reported that mother was suffering from serious and unresolved mental health issues. She presented as paranoid and hyper religious. Father was also enabling mother, and lacking insight into the severity of mother's mental health problems.

Mother's therapist had treated her for two months. Therapy sessions were held over the phone, without video, every other week, for 30 to 45 minutes. They had five sessions together. Mother was guarded at first but was opening up. The therapist did not know mother's diagnosis, noting "it could be depression or maybe anxiety." The therapist knew mother was hearing voices and "exhibiting psychotic features" when she started treating her. The therapist believed mother needed to continue therapy, regularly see a psychiatrist, and take her medications.

According to the January 2021 psychiatric evaluation, mother suffered from depression since she was in high school. She received therapy in the past but was never compliant with it. Mother was "very resistant to answer questions" and provided contradictory answers. She was not willing to take medication

and "only wants to be evaluated so she can close her [dependency] case." Mother told the evaluator there was nothing wrong with her, and she denied any current psychiatric symptoms. The evaluator diagnosed mother with major depressive disorder with psychotic features. His differential diagnosis included bipolar disorder, schizoaffective disorder, schizophrenia spectrum disorder, and PTSD. Mother's prognosis was "guarded."

The Department discussed possible safety plans with father, if the court were to return the younger children home to him at the hearing on the section 387 petition. One acceptable plan was for mother to move out of the home. The other plan would allow mother to remain in the home, provided that she had no unsupervised contact with the children. Father preferred for mother to stay in the family home. Minnie and M.P. were already enrolled in daycare during the week, and father identified another caregiver who could support the family and supervise mother with the children on the weekends.

When the social worker visited the family home, mother confirmed she was still attending her therapy sessions and taking her medication. Father showed the social worker that he had installed an alarm on the bedroom that would be occupied by the children, so he would be alerted if the door was opened. He also had a video baby monitor in the bedroom.

At the March 10, 2021 hearing on the section 387 petition, the juvenile court sustained allegations that mother's failure to comply with the court's orders and address case issues put the children at risk of harm. The allegations against father were dismissed. The court removed the children from mother, ordered B.C. and Y.C. suitably placed, and ordered Minnie and M.P. placed with father under a safety plan, which would include the door alarm, baby monitor, and constant supervision of mother's

8

contact with the children.  Mother was ordered to continue taking her medications, remain in therapy, and continue seeing a psychiatrist.  Mother's visitation with the older children was to be monitored.  Mother timely appealed.

## DISCUSSION

Section 387 provides that an order changing or modifying a previous order by removing a child from the physical custody of a parent shall be made only after noticed hearing upon a supplemental petition.  The supplemental petition must contain "a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child."  (§ 387, subd. (b).)

The hearing on a supplemental petition is bifurcated.  (*In re D.D.* (2019) 32 Cal.App.5th 985, 990.)  First, the juvenile court conducts an adjudication hearing where it must determine by a preponderance of the evidence whether the facts alleged in the supplemental petition are true.  (*Ibid*.)  "[T]he sole issue is whether the allegations in the supplemental petition are true that the previous disposition order has been ineffective in the protection or rehabilitation of the child."  (*Ibid*.)

If the juvenile court finds that the allegations in the supplemental petition are true, the court must then conduct a dispositional hearing to determine whether there is a need to remove the child from the parent.  At the dispositional hearing, the clear and convincing standard for removal from parental custody under section 361, subdivision (c)(1) applies.  (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.)

**1.    Adjudication of the Supplemental Petition**

" 'We review an order sustaining a section 387 petition for substantial evidence.' "  (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 990.)  " 'We do not pass on the credibility of witnesses, attempt

to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding.'" (*Ibid.*)

We find substantial evidence that mother's lack of compliance with her case plan put the children at risk of harm. Mother repeatedly denied she needed services, or medication, even as her paranoid, angry, and unstable behavior continued. She did not undergo a psychiatric evaluation until her children were detained; and even then, she denied any symptoms or mental health issues and told the psychiatrist she was only participating in the evaluation to close her case. Mother's therapist had only minimally engaged with mother, over the phone, and was not even sure of her diagnosis. These facts plainly support a finding that mother's failure to address case issues placed the children at risk.

The prior disposition, which left all the children in mother's custody, was ineffective. Y.C. told the Department that he had to care for his younger siblings because mother left them unattended. Mother yelled at and belittled B.C., scaring the smaller children, and could not be redirected by the visitation monitor. Moreover, father did not appear to appreciate the severity of mother's mental health problems and did not believe she was a threat to the children.

## 2. Disposition

"Before removing a minor from his or her parent's custody, the court must find, by clear and convincing evidence, that '[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no

10

reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.'" (*In re D.D.*, *supra*, 32 Cal.App.5th at p. 996.) "It is not required that the parent be dangerous or that the child have been harmed before removal is appropriate." (*Ibid.*) " 'The focus of the statute is on averting harm to the child.' " (*Ibid.*)

In determining whether a child may be safely maintained in the parent's physical custody, "[t]he court must also consider whether there are any reasonable protective measures and services that can be put into place to prevent the child's removal from the parent's physical custody." (*In re Maria R.* (2010) 185 Cal.App.4th 48, 70.)

As discussed, *ante*, there is ample evidence the children were at risk of harm, and the Department and the court had exhausted all reasonable means to protect them without removing them from mother.

## DISPOSITION

The orders are affirmed.


                                        GRIMES, Acting P. J.

        WE CONCUR:


                        STRATTON, J.     HARUTUNIAN, J.*

---

**\*** Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11